Commonwealth *v.* Zlatovich, Appellant.

Argued March 17, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Henry J. Albaugh,* for appellant.

*John G. Good, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 9, 1970:

The appellant, Mary Alice Zlatovich, was tried in Beaver County before a jury on four indictments charging her with murder. She pleaded "not guilty" and "not guilty by reason of insanity." The jury returned a verdict of guilty of murder in the second degree on each bill. Following the denial of motions for a new trial and a "directed verdict," a prison sentence was imposed on each conviction. This appeal followed.

The first assignment of error asserts that the jury's verdict was contrary to the evidence and the weight of the evidence.

The Commonwealth introduced testimony at trial as follows:

On the night of June 9, 1964, the appellant and a girl friend were in a bar in Midland, Pennsylvania, around midnight and had a few drinks. During the course of their stay, appellant's husband came into the bar and engaged in an argument with her. She threw some keys at him, and, when she refused his request to come home, he departed. About 1 a.m. on June 10th, police officers came upon the husband sitting on the sidewalk near the bar. Appellant then came out of the bar, and the argument between her and her husband was renewed.

The police escorted both to the police station and attempted to reconcile their differences. During this effort, appellant's husband said that he wanted to take their children from her. She replied that she would rather see the children dead, and that neither he nor anyone else would take the children from her.

The police officers talked privately with each party, but the appellant was uncooperative and expressed concern that the officers were plotting with her husband to take her children from her. She left the police station between 2:30 and 3 a.m. and went to the apartment of Orlando Ancrile, a bartender in the bar referred to before, and requested a ride to her home in Ohioville, Pennsylvania. On the way, she told Ancrile that she intended to leave town and take her children with her.

About an hour later appellant's brother-in-law, Bernard Zlatovich, the local chief of police, and Michael Haydin, an assistant chief of police, visited appellant's home and found her holding a rifle. She then told them that she was going to kill her husband. After some conversation, appellant regained her composure and made coffee for her visitors. A little later, she

again became unsettled, left the house and entered a nearby wooded area. Haydin followed and attempted to talk with her, but she expressed resentment towards her husband and the police, and again said that no one would take her children from her. At Haydin's urging, she then calmed down and returned to her home. At about 4 a.m. when she appeared to be normal and at ease, Haydin left the premises. Zlatovich continued his stay for another hour and a half, and then left after concluding that appellant was "very calm" and "all right." He took the rifle and other guns found in a nearby gun rack with him.

At about 6:05 a.m., appellant phoned Chief Zlatovich's home, and when Haydin answered the phone and identified himself, she said in a sobbing voice, "Mike, please come over." The two officers responded immediately to the call and when they arrived at the home, appellant was standing in the doorway between a bedroom and the living room with the youngest of her children alive in her arms. Four other children were found dead in a bedroom as the result of gunshot wounds. Appellant was sobbing and had a .32 caliber revolver in her hand. When Haydin attempted to take the youngest child from appellant's arms, she said, "Mike, please don't take him away from me. I won't hurt him." A little later on, when another police officer approached her and asked if he could take the baby, appellant, still sobbing, replied, "No, please let me have him. I won't hurt him now."

During the Commonwealth's case in chief, in addition to the testimony of Haydin as to appellant's condition at 4 a.m., and that of Chief Zlatovich as to her condition at 5:30 a.m., Ancrile testified that as he drove appellant in his automobile from Midland to Ohioville, she appeared quite normal to him, and that her conduct was in no way different than it had been on several

other occasions when he had been with her. The Midland police officers testified that, while she was in that town's police station, appellant appeared embarrassed about being brought to the station and perturbed about her husband's statement concerning the children, but otherwise she was normal.

On June 11, 1964, a sanity commission was appointed to determine whether the appellant was competent to stand trial. After a hearing, the commission reported that she was not, and the court ordered her committed to Dixmont State Hospital. A second sanity commission, appointed in 1966, again found appellant unable to understand the nature of the charges against her or to assist in her own defense. On the basis of this report, she was recommitted to Dixmont. In April 1967, a third sanity commission was appointed. This commission found her competent to stand trial, and on March 4, 1968, the trial commenced.

At trial, the appellant herself testified and specifically denied shooting her children. In an attempt to sustain the plea of "not guilty by reason of insanity", the defense also introduced the testimony of three admittedly qualified psychiatrists. Two stated that, in their opinion, appellant was suffering from schizophrenia on the morning of June 10, 1964, and was unable to distinguish right from wrong. The third psychiatrist shared this view and in addition stated that he felt appellant could not appreciate the nature and consequences of her acts at the time. A psychologist testified that on the basis of psychological tests which he had administered to appellant, he also concluded appellant suffered from schizophrenia at the time involved. The Commonwealth offered no medical testimony in rebuttal to the above medical testimony.

Despite the Commonwealth's failure to rebut the opinion testimony of appellant's expert witnesses, in

view of the whole record, the question of sanity was for the jury to resolve, and the verdict was not capricious or contrary to the weight of the evidence. *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A. 2d 534 (1964); *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391 (1952). What we said in *Carluccetti* at page 200 is particularly apposite, "There was . . . direct objective testimony concerning the defendant's actions, conversations and statements immediately prior to and on the day of the killings from which the jury could infer that [she] knew what [she] was doing when [she] killed [her children] and knew that it was wrong, which, after all, is the test of legal insanity rather than whether the accused was mentally ill from a medical viewpoint."

The instant case is unlike the situation presented in *Commonwealth v. Vogel,* 440 Pa. 1, 268 A. 2d 89 (1970), for here the Commonwealth *did* offer evidence which warranted a finding of sanity, albeit through the testimony of lay witnesses. The testimony of the appellant's utterances to the police within minutes of the killings ("Mike, please don't take him away from me. I won't *hurt him,*" and "No, please let me have him. I won't *hurt him now*" (emphasis added)) are particularly significant as indicating a mind conscious of the nature of her acts.

It is next complained that the trial court erred in its instructions to the jury on the burden of proof as to the issue of insanity. In the course of the charge, the court stated, in part, that the accused had the burden of proving insanity by the preponderance of the evidence and that the Commonwealth did not have to affirmatively prove sanity. Appellant argues that it was erroneous to so instruct the jury; however, this same contention was rejected by a majority of this Court in *Commonwealth v. Vogel,* supra, and nothing would be gained by further discussion here.

Finally, it is urged that a new trial should be granted, because of a juror's alleged post-trial remarks.

On the day after the verdict was recorded and the jury discharged, a news article in reference to the trial appeared in the Beaver Falls News, which included the following: "After the verdict, one of the jurors said that the jury was afraid to return a verdict of not guilty by reason of insanity for fear that she might be released again in a year or so."

It is argued that the rule long adhered to in Pennsylvania—that testimony of a discharged juror as to what occurred among the jurors in the jury room is inadmissible—is constitutionally invalid and, therefore, that the court below erred in not investigating the accuracy of the news article. Moreover, appellant argues that if the juror's remark proved to be true, due process would require that the verdict be set aside. *Parker v. Gladden*, 385 U.S. 363, 87 S. Ct. 468 (1966) is cited in support of this multi-faceted proposition. In our view, *Parker* is inapposite.

In *Parker*, a court bailiff in an Oregon state criminal trial, who was charged with overseeing the jury during sequestration, made several prejudicial comments to individual jurors concerning the defendant's guilt. The United States Supreme Court found that these comments constituted a violation of defendant's Sixth Amendment rights, made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Specifically, it found that the bailiff's conduct amounted to a denial of defendant's right to a "trial, by an impartial jury . . ." and his right "to be confronted with the witnesses against him . . . ."

The United States Supreme Court's analysis was that the bailiff was, in fact, an unsworn witness who gave testimony against the accused at a time when he was not subject to "confrontation, cross-examination, or

other safeguards guaranteed to the petitioner." *Parker v. Gladden*, supra, at 364, 87 S. Ct. at 470.

The *Parker* decision was predicated on the affidavits of several jurors which related what the bailiff had said; however, the decision did not concern itself at all with the *admissibility* of the jurors' affidavits. This was a matter of Oregon state law and Oregon takes the position that: "[T]here is no absolute rule in this state prohibiting the use of a juror's affidavit to impeach a verdict; the affidavit may be considered but its significance in determining whether a new trial will be ordered is for the court to decide in each case." *State v. Gardner*, 230 Or. 569, 573, 371 P. 2d 558, 559-560 (1962).

The affidavits were apparently deemed admissible by the state court in *Parker* and when the case reached the United States Supreme Court, the question of their admissibility was not at issue.

The question *was* at issue in *Welshire v. Bruaw*, 331 Pa. 392, 200 A. 67 (1938). Although a civil case, the factual pattern bears a great similarity to *Parker*. In *Welshire*, a court tipstaff, in charge of the jury during its deliberations, made several comments to members of the jury in an effort to pressure them into reaching a prompt decision. On one occasion, he refused a juror's request to talk to the judge. In that case, we affirmed the decision of the trial judge in granting a new trial, in view of the inherently coercive effect of the tipstaff's conduct on the jury's deliberations. More pertinently, we also held that the jurors were competent to testify as to the improper conduct of a *third party* whose actions may have tended to affect their verdict and deliberations. However, even in so doing, we made it clear that the jurors' testimony would not be admissible to show "what effect, if any, such misconduct had upon their verdict. Admission of their testi-

mony for this purpose 'would be an inquisition over the consciences of the jurors as to the grounds and reasons of their verdict' which is condemned in Cluggage v. Swan, 4 Binney 150, and again in McPeek v. Shafer, 120 Pa. Superior Ct. 425." *Welshire v. Bruaw*, supra, at 395, 200 A. at 68.

To summarize, while we permit discharged jurors to testify as to the existence of outside influences during their deliberation, nevertheless, we prohibit them from testifying as to the *effect* which these extra-evidentiary influences had upon the jurors in reaching a decision, just as we prohibit jurors generally from recounting the mental processes whereby the jurors arrived at their verdict. We have long held to this evidentiary prohibition for an elemental reason: Little will be gained and much lost by such inquiries.

In the course of a jury's deliberation, each juror weighs countless factors many of which he may not consciously be aware he is even considering. This is a rubric of life. Whenever a choice must be made, few men come to a decision on the basis of one factor alone, but only after weighing all the conflicting variables which inhere in the choice. "[B]eing personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore . . . such testimony should not be received to overthrow the verdict to which all assented." *State v. Kociolek*, 20 N.J. 92, 99, 118 A. 2d 812, 816, 58 A.L.R. 2d 545, 552 (1955). The logic of Mr. Justice William J. Brennan, Jr. (then a member of the New Jersey Supreme Court), in the *Kociolek* case is persuasive.

Moreover, not only would such testimony as to the "grounds and reasons" of the verdict be inherently unreliable, but it would also, in the last analysis prove to be irrelevant. The only act performed by the jury to which any legal significance is attached is the *ren-*

*dering of the verdict.* "[T]he verdict as uttered is the sole embodiment of the jury's act and must stand as such without regard to the motives or beliefs which have led up to its act. The policy which requires this is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the loss of all certainty in the verdict, the impracticability of seeking for definiteness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials if the grounds for the verdict were allowed to effect its overthrow." 8 Wigmore, Evidence §2349. Rule (a) (McNaghten rev. 1961).

We conclude, then, that under the facts here present, the lower court correctly refused to conduct a posttrial evidentiary hearing at which the jurors might be examined. For it cannot be denied, that even if appellant could find the anonymous juror and that juror would be able to reiterate the statement attributed to him in the newspaper account, nevertheless, such testimony, concerned as it is with the motives and reasoning processes—the "grounds and reasons"—behind the jury's verdict, would be inadmissible.

Judgments affirmed.

Mr. Justice Cohen concurs in the result.

---

Dissenting Opinion by Mr. Justice Roberts:

The majority states that since this Court recently approved the proposition that a criminal defendant has the burden of proving insanity by a preponderance of the evidence in *Commonwealth v. Vogel,* 440 Pa. 1, 268 A. 2d 89 (1970), ". . . nothing would be gained by further discussion. . . ." They are probably right, but I cannot again allow the affirmance of a conviction based on what I consider to be an erroneous and unwise view

of the law to pass unchallenged. To impose criminal punishment upon an individual who was, under the strictest standard, mentally incompetent at the time the "crime" was committed is the height of irrationality. It will not deter future criminal acts, it will not appreciably aid in the unfortunate individual's rehabilitation, and, arguendo that vengeance is at least a de facto element of our criminal law, it is barbaric to so punish one who could not control his actions. As I said in *Vogel,* supra: "For a defendant to be guilty of murder, the 'muscular contraction' must be coupled with a mens rea—'malice aforethought express or implied.' Commonwealth v. Drum, 58 Pa. 9, 15 (1868). This mens rea is as much an element of the crime of murder as is the physical act of killing," 440 Pa. at 15, 268 A. 2d at 90, and the Commonwealth should have the burden of proving defendant's sanity beyond a reasonable doubt.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I dissent from that portion of the opinion of the Court which approved the charge of the trial judge relative to the sanity presumption. The pertinent portion of the charge is as follows: "Since sanity is the legally recognized normal condition of human beings, its existence in any given instance is presumed. That means that in the absence of any proof to the contrary, it is assumed that the Defendant had normal mental capacity. Because of the presumption, the duty of establishing insanity as a defense to a criminal charge is . . . upon the one who asserts it. . . . it is incumbent upon her [the defendant] to establish the alleged defective mental condition by a fair preponderance of the evidence. . . . The presumption of sanity, which was mentioned before, holds good and is the full equivalent

of express proof of sanity until that presumption has been successfully rebutted by the Defendant." As in *Commonwealth v. Vogel*, 440 Pa. 1, 268 A. 2d 89 (1970), I do not question the correctness of the charge at the time it was given[1]; the presumption of sanity persisted throughout the trial, as the equivalent of evidence, no matter what evidence was introduced by the defendant to rebut it; and the burden was on the defendant to prove insanity by a preponderance of the evidence.

In *Vogel*, there was not unanimity as to the extent of the function of the insanity presumption, and whether and when the presumption disappears in the face of affirmative rebuttal evidence. Speaking for myself, I continue of the belief that to rebut the presumption of sanity, it should be incumbent upon the defendant to produce competent evidence sufficient to create a reasonable doubt in the mind of the trier of fact; if he does so, the presumption disappears. I expressed the further view that once the presumption has been thus eliminated the burden of persuasion should be upon the Commonwealth to establish sanity, as it must all other facts necessary to support a guilty verdict, beyond a reasonable doubt.

I think the charge was in error, however, under any of the diverse views expressed by the members of the Court who constituted a majority in *Vogel*. While the trial judge in his charge indicated that the presumption was rebuttable, its effect was to allow the jury to consider the presumption (along with affirmative evidence of sanity presented by the Commonwealth), in determining whether the defendant had carried her burden of proving the defense by a preponderance of the

---

[1] The trial in the case at bar took place in 1968; our decision and opinions in *Commonwealth v. Vogel* were not filed until July 13, 1970.

evidence. After qualified psychiatric testimony that defendant was schizophrenic and was not able to appreciate the nature or quality of her acts, the jury's determination as to whether the defense of insanity had been made out by a preponderance of the evidence should have been based only on the evidence pro and con; the presumption had served its purpose and should no longer have been in the case.