646 A.2d 1199

**Harrison A. BORING, Administrator of the Estate of David Paul Boring, Deceased, Appellant,**

**v.**

**Linda L. LAMARCA, Robert H. Leonard and the Penn Monroe,**

**v.**

**T.J.R., INC., T/D/B/A Sorry Charlies, Top Charlies, New York, New York and Tom & Jerrys Inc., Appellees.**

Superior Court of Pennsylvania.

Argued June 30, 1994.

Filed Aug. 24, 1994.

Petition for Allowance of Appeal Denied Dec. 7, 1994.

488

Jan C. Swensen, Pittsburgh, for appellant.

Templeton Smith, Jr., Pittsburgh, for Motorists Mut. Ins., participating party.

Before POPOVICH, SAYLOR and HOFFMAN, JJ.

POPOVICH, Judge.

The appellant, Harrison A. Boring, Administrator of the Estate of David Paul Boring, deceased, appeals the order of the Court of Common Pleas of Allegheny County granting a new trial to the appellee/garnishee, Motorists Mutual Insurance Company. We reverse.

The facts relevant to a disposition of this case appears in the opinion of the court below at pages 1–2; to-wit:

> The case is a wrongful death and survival action arising out of an accident in which Robert R. Leonard, while driving his automobile ran over David Paul Boring who had been lying in the roadway after having been struck by Linda L. LaMarca, a hit-and-run drunk driver. The jury returned a verdict of $331,000, having found LaMarca 56% causally negligent, T.J.J.R., Inc. (who served alcohol to LaMarca and was liable under the Dramshop Act) 30% causally negligent, Leonard 4% causally negligent, and the decedent, Boring, 10% causally negligent. The limits of Leonard's insurance coverage with Motorists Mutual Insurance Company ("Motorists") was $25,000. The limits of LaMarca's coverage with Aetna Casualty and Surety Company was $100,000. Additional Defendant T.J.J.R., Inc., is insolvent. The Estate of Boring settled with LaMarca after trial for $95,000. In order for the Estate to collect its entire award, it is pursuing a bad faith claim against Motorists under its policy with Mr. Leonard. Under the law, if

Motorists is found liable of acting in bad faith, it is responsible for the entire award (less LaMarca's contribution), instead of only its policy limits.

The Estate alleges that Motorists breached its duty of acting in good faith under the contract it had with Leonard, challenging a decision by Motorist not to accept Plaintiff's settlement demands for an amount equal to Leonard's policy limits. In this ancillary proceeding the Estate stands in the shoes of Leonard and is entitled to pursue Leonard's rights under his policy with Motorists. After trial the jury found for the Estate on the bad faith claim.

Subsequent to trial, it came to Motorists' attention that a member of the jury (Scott Matthews) removed a law book from the shelving in the room reserved for the jury's deliberation, looked-up the term "good faith" and read aloud its definition to the other members of the jury. "Among the things which the [law book's] discussion referred to was writing and written notice." See Exhibit "A" (Affidavit of Deborah Jeanett, a juror) and Exhibit "B" (Affidavit of Scott Matthews), both of which are attached to the appellee's appellate brief.

Post-trial motions were filed by Motorists seeking a new trial on grounds that the definition of "good faith" read by the juror to his fellow panel members contained an element ("written notice") not included in the court's charge. Thus, it argued, such a reading "constituted an improper influence on the jury" tainting its verdict. The court agreed and granted Motorists a new trial on grounds that the reading, in the course of deliberations, constituted an "extraneous influence" on a central issue in the case, i.e., such information had not been provided to the jury during trial and was prejudicial to Motorists' "good faith" defense in not settling the case for the policy limits. This timely appeal was perfected by the appellant and raises the sole question of:

Whether the lower court erred in granting Motorists['] . . . Motion for Post–Trial Relief given the lack of competent testimony that the jury was exposed to or influenced by an

extraneous influence and given the evidence presented at trial?

In this Commonwealth it is black letter law that jurors cannot impeach their own verdict by testifying to what occurred during deliberations. *Pittsburgh National Bank v. Mutual Life Insurance Company of New York,* 493 Pa. 96, 425 A.2d 383, 385 (1981). This has been referred to as the "no impeachment" rule. However, in order to accommodate the need to insure fair trials (free from improper influences) against the need for finality and protection of the sanctity of the jury room, a narrow exception has been recognized which permits " 'post-trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations.' " *Id.* at 101, 425 A.2d at 386, quoting *Commonwealth v. Sero,* 478 Pa. 440, 448, 387 A.2d 63, 67 (1978).

Under the exception to the "no impeachment" rule, a juror may testify to the existence of the outside influence, but not to the *effect* the outside influence may have had on deliberations. *Id.,* citing *Commonwealth v. Zlatovich,* 440 Pa. 388, 396, 269 A.2d 469, 473 (1970). In other words, a juror may not testify to his/her subjective reasoning process. *Id.*

Most recently, our Supreme Court in *Carter by Carter v. U.S. Steel Corp.,* 529 Pa. 409, 604 A.2d 1010 (1992) (plurality opinion) set forth some guidelines in deciding whether outside influences impacted/prejudiced a jury's deliberations so as to justify the award of a new trial.

In *Carter,* the appellant was injured when he entered onto USX property and was electrocuted (resulting in amputation of his left forearm and one of his toes) when he grabbed an uninsulated high voltage wire. The jury awarded the appellant (after molding) 1.2 million dollars. The trial court, however, granted USX a new trial after concluding that a television broadcast, viewed by two of the jurors and discussed during deliberations, was prejudicial. This Court affirmed, but on allocatur to the Supreme Court the grant of a new trial was reversed.

■ In the course of reversing, the Supreme Court acknowledged the allowance of *testimony* by jurors concerning exposure to the broadcast and reference to it during deliberations was permissible since it was *not* testimony of the jury's reasoning process. Rather, it was testimony of overt conduct which, when related to an issue in the case, may create a potential for prejudice and call for the issuance of a new trial. Continuing, the *Carter* Court held that, in evaluating the reasonable likelihood of prejudice, the trial judge should consider: 1) whether the extraneous influence relates to a central issue in the case; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

In applying the considerations set forth above, the Supreme Court held (in a lead opinion by Justice Larsen, joined by Papadakos, J., concurred in result by Zappala & Cappy, JJ., and dissented to by Nix, C.J., with opinion joined by Flaherty & McDermott, JJ.) that the television broadcast (relating that a subsequent death of a youth at the same site the appellant was injured was caused allegedly by the absence of posted danger signs by USX) was not prejudicial because the purported failure of USX to take precautions after Carter's accident was not new information because this was readily apparent when the jurors viewed the site during trial.

Second, the Supreme Court found the absence of prejudice from the fact that the trial court instructed the jury, in pertinent part, "You should not be influenced by anything other than the evidence and the law of the case." Lastly, the trial court additionally directed the jury before deliberations to "reach a fair conclusion from the evidence and applicable law." From all of the preceding, the Court ruled that there was no reasonable likelihood of prejudice arising from the broadcast.

Instantly, consistent with *Carter*, the trial court looked to the tripartite test referred to in *Carter* in concluding that: 1) the reading by juror/Matthews to his colleagues constituted "extraneous influence" as to the definition of "good faith,"

which was central to the appellant's "bad faith" suit against Motorists; 2) the affidavit of juror/Jeanett mentioned "writing or written notice" being read by juror/Matthews with regard to the term "good faith," elemental aspects missing from the trial court's instruction on the same subject; and 3) albeit the trial court could not find anything suggesting any emotional or inflammatory evidence, it concluded that there was a reasonable likelihood of prejudice generated by the extraneous influence. We agree with some but not all of the trial court's observations, and, therefore, find that the trial court abused its discretion in awarding Motorists a new trial.

To explicate, we find that juror/Matthews' reading to his fellow jurors the definition of "good faith," extracted from a legal book in the deliberation room, constituted "extraneous influence" in that the information was not provided in open court or vocalized by the trial court via instructions. *Carter,* supra; see Concurring Opinion by Roberts, J. in *Pittsburgh National Bank,* supra.

However, we do not know, consistent with the second prong of *Carter's* guide posts, whether the information read to the jury by Matthews was information it did not have at trial. In contrast to *Carter* (and the cases cited therein), at bar we are not privy to the entire substance of the information allegedly communicated to the jury during deliberations, save for juror/Jeanett's reference in her affidavit to "writing or written notice" being discussed by the text read from by juror/Matthews. This scant disclosure of information falls woefully short of the requirement in *Carter* allowing a trial judge to assess the prejudicial effect of such extraneous influences, *but only after "the existence of a potentially prejudicial extraneous influence has been established by competent testimony."* 529 Pa. at 420, 604 A.2d at 1016 (Emphasis added). In particular, the Court wrote:

> In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence. In addition, cases from other jurisdictions which have considered *the prejudicial effect of an extraneous influence,* make

clear that prejudice *is to be determined in light of the facts and circumstances in each case.* *"Where ... the precise extraneous matter is known* but direct evidence as to its effect on the deliberations is not permitted, *a sound balance is struck by a rule which looks to the probability of prejudice from ·the face of the extraneous matter in relation to the circumstances of the particular case."*

*Id.* (Emphasis added). *Sub judice,* the precise extraneous information is not known. This inhibits the ability to engage in a balancing which looks to the probability of prejudice in light of the extraneous matter viewed in the framework of the case as a whole. Stated otherwise, we are only provided with a reference to a reading from a law book, the details of which consist of no more than a mention to the book discussing "writing or written notice" on the topic of "good faith." We are left in the dark as to how these terms were woven into the reading, i.e., did they consist of elemental aspects of the definition of good faith? Were the terms used in the negative or positive as part of the good faith definition? Were they merely collateral to the text-book discussion read by juror/Matthews on good faith? These areas could have been clarified had Motorists either deposed juror/Matthews or requested a post-trial hearing to resolve the potential prejudice to its case because of the alleged reading. See *Carte,* supra. It failed to act in a fashion to clarify an issue of doubt.

Motorists' oblique reference to a claimed prejudicial effect of an outside influence upon a jury's deliberation sheds no light on the ultimate question of *potential* prejudice. See *Carter,* supra (cases cited therein all detail the allegedly prejudicial conduct, which permitted a weighing of its potential prejudicial effect on the jury's verdict).

Accordingly, we fail to discern how the trial court could "conclude[ ] that the extraneous influence provided the jury with information it did not have" when we have but a fleeting reference to two phrases ("writing" and "written notice") as the sum and substance of what was read by juror/Matthews. Therefore, the trial court could not decide the second prong of the *Carter* test, i.e., whether the extraneous influence provided

the jurors with information they did not have before them at trial.

Even if, *arguendo*, we were to hold that the reference to "writing" and "written notice" in juror/Jeanett's affidavit was sufficient information to decide whether it was not provided to the jury through the trial court's instructions, the quantity and quality of the "information" communicated to the jury precludes this Court from complying with *Carter's* third step: whether the extraneous influence was emotional or inflammatory in nature, i.e., was it reasonably likely to have *prejudiced* the jury. *Carter*, supra, 529 Pa. at 422 & n. 7, 604 A.2d at 1017 & n. 7.

Even the trial court, on this third point of whether the information was emotional or inflammatory, conceded that "[t]here [wa]s nothing in the affidavits that suggests any emotional or inflammatory evidence." Trial Court Opinion at 6. As to the trial court's conclusion that "a different legal standard" from that outlined in its charge to the jury was interjected into the case by juror/Matthews' reading, this is pure speculation and surmise given the paucity of information as to exactly what was communicated to the jury.

Further, as in *Carter*, the trial court here directed the jury not to be influenced by any information obtained outside the courtroom; to-wit:

> ... I'm going to instruct you as to the law that you must apply to this case. The law applicable in this case is contained in these instructions. You should consider them as a whole and not pick out one or more instruction and disregard others. I caution you at the outset not to allow any sympathy, any prejudice or any other emotion to influence you. It is your duty to base your decision strictly on the evidence. The evidence which you are about to consider in reaching your decision consists of the testimony that you heard and the exhibits that you saw introduced. You must consider the testimony of all the witnesses and all of the exhibits, but you must not consider any testimony or exhibits to which I have sustained an objection or which I

ordered stricken from the record. You are here for one purpose and one purpose alone. That is to discover the truth and to apply the law that I will explain to you to the truth as you discover it.

\* \* \* \* \* \*

I'd like to now direct your attention to what we call the substantive law that is to be applied to this case. This is a case involving the obligation of an insurance company under the contract of insurance that it has with its insured.... In this case the plaintiff alleges that Motorists Mutual breached its duty of acting in good faith under the contract of insurance it had with Robert Leonard. This is a duty imposed by law to be applied to every contract of insurance.

\* \* \* \* \* \*

Your duty is to decide under the facts of this case and the law that I will now explain to you whether Motorists is liable to the Boring estate for money damages beyond the limits of Leonard's liability insurance coverage. The theory of Plaintiff's claim is that Motorists violated the duty of good faith that it had toward its insured, Robert Leonard.

Under an insurance contract, the insurer, the insurance company, has the right to exercise control over the disposition of claims against the insured within the policy limits whether it be by settlement or litigation. Thus, both the insured and the insurer have definite and separate interests in the disposition of such claims. Where there is little or no likelihood of a verdict or even a settlement within the limits of the policy coverage, the separate interests of the parties are, in effect, substantially hostile. Under such circumstances, it becomes all the more apparent that the insurer must act with the utmost good faith towards the insured in disposing of claims against the insured.

By asserting in the policy the right to handle all claims against the insured including the right to make a binding settlement, the insurer becomes—the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the

interests of the insured. If the insurer is derelict in this duty as when it negligently investigates a claim or unreasonably refuses an offer of settlement, it may be liable regardless of the limits of the policy for the entire amount of the judgment secured against the insured.

In other words, an insurance company owes its insured a duty of good faith, and a violation of that duty may lead to liability for the full amount of a verdict obtained against the insured. *Good faith in the context of a decision not to settle must be a thoroughly honest, intelligent and objective one. It requires more than proof of sincerity. It must be a realistic one when tested by the necessarily assumed expertise of the insurance company.* This expertise must be applied in a given case to a consideration of all the factors bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier, that is the insurance company, or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict should it be adverse, the strengths and weaknesses of all the evidence to be presented on either side so far as known, and the relative appearance, persuasiveness and likely appeal of the claimant, the insured, and the witnesses at trial.

There is no absolute duty on the part of an insured to settle a claim just because a possible judgment against its insured may exceed the amount of insurance coverage under the policy or merely because the insured demands that the claim be settled. Therefore, it is not enough for Plaintiff to simply prove a rejection by the insurer of an offer to settle the claim for the limits of the policy. In accordance with the laws that I have explained to you, in order for the Plaintiff to recover damages from Motorists in excess of the limits of Mr. Leonard's liability insurance coverage, Plaintiff must prove that Motorists violated a duty of good faith in dealing with the original claim that Plaintiff had against Leonard.

In order to prove that Motorists violated its duty of acting in good faith, Plaintiff must prove that Motorists' decision

not to accept Plaintiff's settlement demands for the policy limits of $25,000 was not a thoroughly honest, intelligent and objective one.

In evaluating behavior and attitude of Motorists in handling the Plaintiffs' request for the policy limits in full settlement of Plaintiff's claim against Mr. Leonard, you must focus your attention on the facts and circumstances in appearance at the time of the request for settlement were made.

\*     \*     \*     \*     \*     \*

*You are to remember the testimony of the principles of law that I have given you ... You apply the law that I have given you to the facts as you find them and, thus, render a true and just verdict.*

\*     \*     \*     \*     \*     \*

*You should not be influenced by anything other than the evidence and the law in this case:*

N.T. 11/19/92 at 4–5, 12–17, 18 & 21 (Emphasis added).

In light of the detailed and lengthy instructions provided by the court on the question of "good faith" conduct by the insurer/Motorists, we hold that juror/Jeanett's affidavit contains insufficient information of the extraneous influence to which the jury was exposed. Accordingly, this Court cannot say with any degree of assuredness that there was a reasonable likelihood of prejudice, on the issue of "good faith," because the jury was informed of the terms "writing and written notice."

Unaware of the sequence in which the terms recalled by juror/Jeanett were read to the jury at large, whether preceded or succeeded by negative or positive modifiers (e.g., "no" writing or written notice required by the insurer to establish "good faith" behavior or a writing or written notice is required as a condition precedent to establish "good faith" conduct by the insurer), we are left to speculate and surmise as to the context and substance of the complained-of communication. This we may not do.

Therefore, consistent with the precepts made mention of in *Pittsburgh National Bank* and expounded upon by *Carter,* supra, the ultimate objective being to foreclose the surfacing of *prejudice* against the insurer/Motorists, we hold that the trial court abused its discretion in finding that Motorists was likely prejudiced by the ex parte communication taking place during the jury's deliberation.

Order reversed, original verdict reinstated and jurisdiction is relinquished.