**Boyd v. Hershey Medical Center**

558

C.P. of Dauphin County, no. 2386 S 1993.

*William A. Atlee Jr.,* for plaintiffs.
*Grant M. Fleming,* for defendants.

TURGEON, *J.,* April 9, 1999—Plaintiff-minor Stevie Baum, through her parents, Terri Boyd and Matthew Baum, claimed defendants Peter Cherouny M.D. and Barbara DiPietro-Steele M.D. were negligent during

Stevie Baum's birth May 8, 1988. Dr. Cherouny was Terri Boyd's attending obstetrician and Dr. DiPietro-Steele a first-year obstetrical resident. They asserted defendant-hospital, Milton S. Hershey Medical Center, was vicariously liable.

On November 12, 1998, following an eight-day trial, the jury returned a defense verdict, having found none of the defendants negligent. Plaintiffs filed a motion for post-trial relief and supplemental motion seeking a new trial, which I denied by March 23, 1999 order. This opinion is written in support of that decision.

Plaintiffs raised four issues in their post-trial motions:

"(1) Notes taken by a juror and available to the jury during deliberations constitutes reversible error.

"(2) The court erred in failing to instruct the jury that defendants were held to a dual standard of care; specifically, that physicians are held to the same degree of care as would a reasonable person under the circumstances.

"(3) The jury's verdict was against the weight of the evidence.

"(4) The court erred in not requiring defendants to adhere to the trial schedule agreed to by the parties."

## FACTS

Plaintiffs claimed Drs. Cherouny and DiPietro-Steele allowed Terri Boyd's second stage labor to extend too long without performing a cesarean section. As a result, Stevie Baum allegedly suffered perinatal asphyxia (oxygen deprivation) causing hypoxic ischemic brain damage resulting in Stevie Baum's cerebral palsy.

In September 1987, 31-year-old Terri Boyd began to receive prenatal care at Hershey Medical Center. Her pregnancy was considered high risk due to her

history of ulcerative colitis and a 1981 early labor which resulted in the premature delivery, at 31 weeks, of her son Devlin who is also afflicted with cerebral palsy. Nevertheless, her pregnancy proceeded without complication and her colitis was controlled with medication. An early amniocentesis demonstrated a normal female fetus and a 31-week ultrasound showed fetal size around the 50th percentile.

On May 7, 1988 at 11 a.m., mother experienced initial contractions and was admitted to the hospital around 2:30 a.m. the following morning, Her water broke at 5 a.m., at which time the amniotic fluid was clear. At 10:20 a.m., the baby experienced a two-minute episode of slow fetal heart rate (bradycardia) of 95-98 beats per minute. A second episode occurred at 2:30 p.m. during which her heart rate was 80-90. However, it returned to 130 with a change in fetal position. Normal fetal heart rate is 120-160 beats per minute. Fetal scalp pH's, which measure fetal oxygenation, were taken at 9 a.m. (pH 7.23) and 3:25 p.m. (pH 7.33) and demonstrated fetal well-being.

At 4:15 p.m., the baby had not proceeded beyond zero station. At 5:10 p.m., mother reached full cervical dilation, marking the onset of second stage labor during which descent of the fetal head should occur. The second stage of labor in a woman who has previously delivered vaginally, normally lasts one to two hours. During the second stage, fetal heart rate monitoring demonstrated episodes of bradycardia accompanied by late/variable decelerations. There was very little progression of the fetus through the birth canal during this stage.

At 8 p.m., mother was taken to the delivery room in an effort to expedite delivery. At that time, the baby had reached only plus one station down the birth canal. By 8:40, she was still at plus one station and Dr. Cher-

ouny became concerned the baby may not have sufficient reserves for delivery, although he believed the baby was tolerating delivery and saw no need for c-section preparation. At approximately 8:44 or 8:45 p.m., Dr. Cherouny attempted a manual rotation of the fetus, following which there was an immediate sudden drop in fetal heart rate from a 120 baseline to 60-80 beats per minute, from which the fetus did not recover. Fetal heart rate remained between 60-80 for approximately 20 minutes, and then dropped further to 40-50 for approximately five minutes. Also, immediately following the manual rotation of the fetus, thick meconium was detected in the amniotic fluid. Both the sudden drop in the baby's heart rate and the presence of thick meconium concerned Dr. Cherouny.

Dr. Cherouny attempted delivery by forceps immediately after the manual rotation. Defendants testified the baby was at plus two station at this time, indicating a low forceps delivery. Plaintiffs disputed this fact, arguing the baby was still at plus one station, warranting a high forceps delivery. Nevertheless, this procedure was abandoned after both Dr. Cherouny and chief obstetrical resident Dr. Mary Danca were unable to lock the forceps around the baby's head. At 8:50 p.m., Dr. Cherouny attempted delivery by vacuum extractor, which initially failed. At 9 p.m., Dr. Cherouny called for a "stat" c-section. While c-section preparations were underway, delivery was managed with the vacuum extractor at 9:09 p.m., three hours and 54 minutes after commencement of second stage labor. The baby was born small for gestational age, under the 10th percentile.

Upon delivery, the baby was floppy and unresponsive, not breathing, with a heart rate in the 40s. Attending pediatrician Dr. Abba Cargan removed meconium from her esophagus and intubated her 30 seconds after birth.

Shortly thereafter, she was resuscitated after her heart rate could not be detected. Within two minutes, her heart rate went up to 150. Her Apgar scores were one at one minute and three at five minutes. Dr. Cargan's neurological exam in delivery room was abnormal. Attending neonatal intensive care unit pediatrician Keith Marks M.D. evaluated the baby the morning of May 9, 1988. He diagnosed her as having incurred perinatal asphyxia, the symptoms of which included global signs of hypoxic-ischemic insult. He noted her low heart rate prior to delivery, presence of meconium, failure to breathe at delivery, need for resuscitation, lack of spontaneous ventilation until 20 minutes following birth, hypotonic condition, seizure development and oliguria (not passing urine).

Dr. Richard Naeye examined mother's placenta May 9, 1999. He found it growth-retarded—below the 10th percentile in weight for a 41-week pregnancy. In addition, he found the presence of stage 1 acute chorioamnionitis, an area of placental infection. The umbilical cord, which had remained attached to the placenta, was only 18.5 centimeters long, about one-half normal length, although cord diameter was above average.

## LEGAL DISCUSSION

### Juror Note-Taking

Following the verdict, plaintiffs learned the jury foreman had taken notes during the course of the trial and had taken them into the jury room during deliberations. In an affidavit, the foreman stated that he asked a person he thought to be a court bailiff whether note-taking outside the courtroom was permissible and was told that it was. He stated he wrote down his recollection of the testimony during lunch breaks and at home after

the end of each day. He did not take any notes during the trial in the courtroom. He stated that during deliberations, he referred to and commented from his notes. Two other jurors provided affidavits confirming the foreman brought his notes into the deliberation room and that he was selected jury foreman because he had taken notes. One of the jurors also stated the notes were available for jury review and were relied upon by the jury.

To the extent the Pennsylvania Supreme Court has addressed the issue, it has held that juror note-taking, in civil cases, is discouraged and "generally is forbidden." *Fisher v. Strader,* 399 Pa. 222, 223, 160 A.2d 203 (1960) (quoting *Thornton v. Weaber,* 380 Pa. 590, 112 A.2d 344 (1955)).[1] The applicable law, where such misconduct occurs potentially affecting jury deliberations, was most recently set forth by the Supreme Court, as follows:

"The rule in Pennsylvania, as well as in a majority of jurisdictions, is that a juror is incompetent to testify as to what occurred during deliberations. *Pittsburgh National Bank v. Mutual Life Insurance Company,* 493 Pa. 96, 425 A.2d 383 (1981). This rule is often referred to as the 'no impeachment' rule. However, in order to accommodate the competing policies in this area, a narrow exception has been recognized. The exception

---

1. However, the trend in civil cases is to allow notes. A proposed amendment to Pennsylvania Rule of Civil Procedure 223, Conduct of the Jury Trial, would allow trial judges to permit jurors to (i) take notes and use them throughout the trial and during the jury's deliberation . . . ." The explanatory comment states that "[t]he purpose of the proposed amendment is to facilitate the jurors' understanding of the case." Proposed Pa.R.C.P. 223(b)(2)—Civil Procedural Rules Committee, proposed recommendation no. 154. Note-taking in criminal cases is expressly prohibited. Pa.R.Crim.P. 1113, 42 Pa.C.S.

permits 'post-trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations' (*Id.* at 493 Pa. 101, 425 A.2d at 383). Under this exception, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. . . . *Commonwealth v. Zlatovich,* 440 Pa. 388, 269 A.2d 469 (1970). Under no circumstances may jurors testify regarding their subjective reasoning processes." *Carter by Carter v. U.S. Steel Corporation,* 529 Pa. 409, 415, 604 A.2d 1010, 1013 (1992).

Defendants argue the "no impeachment rule" applies in this case since the jurors' affidavits concern events transpiring in the jury room. They argue this rule's narrow exception does not apply since the foreman's notes cannot be considered an "extraneous influence." *Carter, supra.* They argue this case is analogous to *Friedman v. Ralph Brothers Inc.,* 314 Pa. 247, 171 A. 900 (1934) and *Pittsburgh National Bank, supra.* In both cases, the Supreme Court upheld lower court decisions, holding inadmissible, testimony that jurors had undertaken independent research of trial issues. In *Friedman,* a juror visited the accident scene and took measurements, and in *Pittsburgh National Bank,* a juror inspected a vehicle similar to the one in issue. The *Friedman* court held the juror's measurements could not have influenced the jury because that information was already available to it. *Id.* at 250. Without discussion, the *Pittsburgh National Bank* court cited *Friedman* as the basis for holding juror testimony inadmissible. *Pittsburgh National Bank* at 101, 425 A.2d at 386.

Plaintiffs argue that the guidelines for evaluating influences which might potentially affect jury deliberations, as set forth in *Carter by Carter,* are not applicable

here since juror note-taking is sui generis. Although plaintiffs concede they must prove actual prejudice to warrant a new trial, they argue use of juror notes during deliberations is such a severe event, it constitutes actual prejudice. In support, plaintiffs rely upon *Fisher v. Strader, supra.* There, prior to jury deliberations, it came to the court's attention two jurors had taken notes during trial. The court confiscated the notes and the jury returned a defense verdict. Plaintiffs' new trial motion, on the basis that the note-taking prejudiced their right to a fair trial, was denied. The Supreme Court affirmed, finding no prejudice to plaintiffs. However, in dicta, the court warned of the danger of juror notes in the deliberation room:

"In Pennsylvania, in many comparable situations, it has been frequently and consistently ruled that any irregularity or misconduct on the part of a juror during the trial of a case is not such as to warrant a new trial, unless it appears that the act complained of actually prejudiced the rights of the parties involved . . . . We see no resulting prejudice herein. *The notes were not taken into the jury room and were, therefore, not relied upon by the 12 in their consultation and it is this prejudicial practice that is the main sin which the no-note-taking rule aims to obviate. It is when this happens that the danger of overemphasizing the importance of the notes made by a juror materializes, causing other members of the jury to underestimate, if not totally disregard, the power and value of their own recollection of the evidence. It also places the note-taking juror in a position of superiority in his own eyes and in those of the other jurors, and sets up a situation wherein a juror may attempt to exert an undue and unfair influence."* *Id.* at 224-25. (citations omitted) (emphasis added)

All of the dangers juror notes can create, identified above by the Supreme Court, may have conceivably

occurred here. In addition, the juror here did not take his notes contemporaneously but perhaps hours after the evidence presentation. Thus, we are faced with the question of whether the *Fisher* dicta indicates an intent by our Supreme Court to bypass the no impeachment rule, which would be otherwise applicable to juror note-taking situations. If so, plaintiffs would appear entitled to a new trial, having established the type of prejudice outlined in *Pierce.* However, we believe the impeachment rule does in fact apply, in light of a subsequent Supreme Court case: *Commonwealth v. Pierce,* 453 Pa. 319, 309 A.2d 371 (1973).

In *Pierce,* two jurors took notes and used them during deliberations, which resulted in a guilty verdict. One juror provided an affidavit so stating. Defendant sought a new trial and the trial judge, refusing to admit the affidavit, denied the request. The Supreme Court found no error, holding that although Pennsylvania law prohibits a juror from taking and using notes in the jury room, the equally established no impeachment rule also applied. Under that rule, the court concluded the juror's affidavit "was not competent evidence to show that notes were used in the jury room." *Id.* at 322. Thus, the dangers cited in the *Fisher* dicta—that notes would be relied upon by the jury, that other jurors would underestimate or disregard their own recollection of evidence or that the note-taking juror would wield undue or unfair influence—could not be "learned" under the no impeachment rule since jurors would be required to divulge their subjective reasoning in reaching their verdict. Thus, according to *Pierce,* juror note-taking does not allow for a separate analysis and, thus, we must turn to the *Carter* guidelines.

Under *Carter,* we first determine whether the notes were in fact an "extraneous influence," and second,

if so, whether plaintiffs can prove they were prejudiced, under the narrow exception to the no impeachment rule. An extraneous influence consists of "information . . . not provided in open court or vocalized by the trial court via instructions." *Boring v. LaMarca,* 435 Pa. Super. 487, 493, 646 A.2d 1199, 1202 (1994) (citing *Carter* and *Pittsburgh National Bank* (concurrence), *supra*). On this issue, the foreman specifically stated that "[t]hroughout the course of trial, during the lunch breaks, and at home after the end of the testimony for the day, *I took notes of the testimony that was given."* This is the extent of the evidence as to the source of the juror's notes. Since the foreman noted only information provided in open court, the narrow exception to the no impeachment rule does not apply.[2] Accordingly, we cannot consider the jurors' affidavits as competent evidence as to what took place during jury deliberations, and plaintiffs are thus unable to show prejudice.

Nevertheless, even if we consider the notes an extraneous influence, we would conclude plaintiffs have failed to establish the prejudice required to warrant a new trial. Where an extraneous influence appears, the impartiality and integrity of the jury is implicated and the potential for jury prejudice arises. *Carter* at 419, 604 A.2d at 1015-16. Thus, the trial judge must determine whether the extraneous influence caused "a reasonable likelihood of prejudice." *Id.* at 421, 604 A.2d at 1016. The court's inquiry is "how an objective, typical juror would be affected by such an influence," since the court is precluded from delving into any sub-

---

2. Although the *Pierce* holding would seem to preclude us from even looking at the jurors' affidavits, we feel it appropriate to examine them to determine whether they allude to any out-of-court influences as the source of the foreman's notes.

jective jury impact the extraneous influence may have had. *Id.* at 420, 604 A.2d at 1016. In making the reasonable likelihood of prejudice determination, the trial judge must consider "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." *Id.* at 421-22, 604 A.2d at 1017. (footnote omitted) The burden of proving reasonable likelihood of prejudice is on the party claiming prejudice. *Id.*

In evaluating the likelihood of prejudice under *Carter,* we must initially determine what portions of the jurors' affidavits are admissible under the no impeachment rule's narrow exception. We find admissible the juror statements that the foreman took notes over the course of the whole trial, took them into the jury room, referred to and commented from them during deliberations and that the notes were available for review by other jurors. *Carter* at 419, 604 A.2d at 1015 (testimony that deliberating jurors discussed a TV broadcast concerning issues before it at trial was admissible since the jury's subjective reasoning process was not involved). However, the juror-affiant's statements are inadmissible to the extent they averred the foreman was so chosen because he had taken notes and that the jury relied upon the notes in deliberating. This is information directly relating to the jury's reasoning processes. *Id.*

With this information in mind, we apply the first *Carter* consideration—whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue. Clearly, the notes involved central issues in the case since the notes were taken over the course of the whole trial. Regarding *Carter's* second consideration—whether the extraneous influence pro-

vided the jury with information not before them at trial—the trial judge must know the "precise extraneous information" to make this determination. *Boring* at 494, 646 A.2d at 1202-1203. In *Boring,* the Superior Court held the trial court erred in finding the extraneous influence caused a reasonable likelihood of prejudice. Specifically, the court held that where evidence was lacking as to the precise nature of the extraneous influence, the trial court could not have determined the jury was provided with new information. *Id.* at 494, 646 A.2d at 1203. Similarly, we do not know with any level of precision the substance of the information communicated or available to the jury. We have not been provided with the foreman's notes nor have we been apprised which portions, if any, were utilized by the jury during deliberations. Without this information we cannot, as a matter of law, evaluate whether the notes provided the jury with new information. Accordingly, plaintiffs have not proven a reasonable likelihood of prejudice resulting therefrom and a new trial is unwarranted.[3]

## *Dual Standard of Care Instruction*

Prior to jury deliberations, this court rejected plaintiffs' proposed jury instruction which set forth a dual standard of care[4] and instead provided the following instruction:

---

3. Whether the extraneous influence was emotional or inflammatory in nature is a moot issue. Nevertheless, there is no indication the notes were either of an emotional nature or inflammatory, although this consideration would not have alone substantially influenced our determination of the reasonable likelihood of prejudice.

4. Plaintiffs' proposed instruction provided as follows:

"Again, a dual standard of care governs physicians: that of the medical profession, and that of a reasonable person under the cir-

"A physician must have and use the same knowledge and skill and exercise the same care as that which is usually had and exercised in the medical profession. A physician whose conduct does not meet this professional standard of care is negligent.

"A physician who holds himself out as a specialist in a particular field of medicine must have and exercise that same knowledge and skill as that which is had and exercised by other specialists in that same medical specialty. A specialist whose conduct does not meet this professional standard of care is negligent.

"Now, under the standard of care a physician, just as those of you who are in particular professional areas, must be informed of the contemporary development

---

cumstances. In other words, to recover against a physician, a plaintiff 'must prove either that (1) the physician did not possess and employ the required skill and knowledge, or (2) that he did not exercise the care and judgment of a reasonable man in like cases *and* that the injury complained of either (1) resulted from the failure on the part of the physician to possess and employ the required skill and knowledge, or (2) resulted from his failure to exercise the care and judgment of a reasonable man in like circumstances.'

"In other words, a physician must both meet the medical standard of care, and also do that which a reasonable person would do under the circumstances presented. If you find that the defendants failed to either meet the medical standard of care, or act as a reasonable person would have under the circumstances, you may find that the defendant's negligent.

"It is plaintiffs' contention that the conduct of the defendant, Peter Cherouny M.D., either viewed in the light of the skills and knowledge usually possessed by other medical professionals, or in light of how a *reasonable* person would have acted under similar circumstances, was *careless* and *negligent.* You must decide whether the evidence has shown that the defendant-physician breached the standard of care which was established by the plaintiffs' medical witnesses at trial, and whether he acted in a *careless* manner in labor and delivery of Stevie Baum; failing to exercise the ordinary care which a reasonably prudent person would have exercised in the circumstances."

in the medical profession or specialty, and they must use those current skills and knowledge.

"In other words, a physician is bound to be up to the improvements of the day in medical skills and if that physician fails to inform themselves of those advances in the medical treatment of their patient, they are under the law what we call negligent.

*"A physician must also use the same degree of care as would a reasonable person under the circumstances.*

"You must decide whether the defendant was negligent in any of these respects. . . ." (N.T. 11/12/98 closings and charge at 62-3.) (emphasis added)[5] Since this charge included a dual standard of care, plaintiffs' allegations are without merit.

### Weight of the Evidence

Plaintiffs argue that, based upon the fetal status and length of second stage labor, Dr. Cherouny should have called for a c-section team at the time he attempted the manual rotation or when he decided to effect delivery by forceps, as was the standard of care in 1988. Plaintiffs argued that had Dr. Cherouny been prepared for a c-section at that time, the baby could have been delivered within a matter of minutes as opposed to undergoing nearly 25 minutes of acute fetal distress causing her brain injury resulting in cerebral palsy. They argue the evidence was so weighty as to these propositions that a new trial must be granted in their favor. Defendants disputed that it was necessary for a c-section to be called at any time and that, even so, the hypoxic event did not cause the baby's cerebral palsy.

A new trial is properly granted where the verdict was against the weight of the evidence. *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985). "A party is entitled to a new trial based on the weight of the evidence only where the verdict

---

5. This instruction is taken almost verbatim from Pa.S.S.J.I. 10.03A (July 1991).

is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. . . . [The appellant] is not entitled to a new trial where the evidence is conflicting and the [finder of fact] could have decided either way." *Petrasovits v. Kleiner,* 719 A.2d 799, 803 (Pa. Super. 1998) (quoting *Gottfried v. American Can Co.,* 339 Pa. Super. 403, 489 A.2d 222 (1985), *appeal denied,* 549 Pa. 704, 700 A.2d 443 (1997)). When considering a new trial motion on a weight of the evidence challenge, we must review all evidence presented. *Farelli v. Marko,* 349 Pa. Super. 102, 105, 502 A.2d 1293, 1295 (1985).

The jury found neither Dr. Cherouny nor Dr. DiPietro-Steele negligent. While the testimony was quite compelling, the plaintiffs' expert testimony was contradicted by defendants' expert. Plaintiffs' expert Dr. Leslie Iffy, an obstetrician-gynecologist with a subspecialty in fetal medicine, found Dr. Cherouny deviated from the standard of care by allowing second stage labor to go beyond two hours without deciding on a delivery method. (N.T. 11/4/98 vol. 1 at 44-45.) In addition, although not critical of Dr. Cherouny's decision to forego calling a c-section team prior to manual rotation, he found such failure below the standard of care when the rotation resulted in a significant bradycardia. (N.T. 11/4/98 vol. 2 at 7-8.) Similarly, although not critical of Dr. Cherouny's decision to attempt forceps delivery, he found Dr. Cherouny in violation of the standard of care for not having a c-section team available at the time forceps were attempted. (N.T. 11/4/98 vol. 2 at 11, 13.)

Defendants' expert, obstetrician-gynecologist Dr. Joel Polin, provided conflicting testimony on these points. He testified that first stage labor proceeded normally—first stage fetal bradycardia was not abnormal and fetal scalp pH tests confirmed normal fetal oxygenation. (N.T. 11/12/98 at 12, 16.) He testified second stage labor

proceeded normally as well. He noted that the two-hour ceiling for second stage labor in a woman who has previously vaginally delivered children is an arbitrary limit, especially since physicians have available to them electronic fetal monitoring to individually assess cases. He testified all fetal monitoring, including fetal heart rates, up until 8:45 p.m., were reassuring. (N.T. 11/12/98 at 15-17.) Furthermore, he noted the mother's labor was prolonged by use of an epidural as well as the fact her only other vaginal delivery was of a premature (small) infant. (N.T. 11/12/98 at 18.)

Dr. Polin also testified Dr. Cherouny's decisions to perform a manual rotation, forceps delivery and vacuum delivery, without having alerted the c-section team, were within the standard of care. (N.T. 11/12/98 at 21-25, 28.) Dr. Polin testified that even if one agreed with Dr. Iffy that Dr. Cherouny should have called for c-section preparation immediately following manual rotation, no breach of the standard of care occurred. (N.T. 11/12/98 at 22.) Both Drs. Polin and Iffy testified that, under the American College of Obstetrics and Gynecology standards, a c-section team has a maximum of 30 minutes from the time it is called until the incision is made. (N.T. 11/4/98 vol. 2 at 9-10, 38; N.T. 11/12/98 at 24.) In this case, the bradycardia following rotation occurred at approximately 8:44 or 8:45 p.m. and delivery at 9:09 p.m. Thus, even under Dr. Iffy's evaluation, the 30-minute response was met. (N.T. 11/4/98 vol. 2 at 39; N.T. 11/12/98 at 25.) Accordingly, the jury's verdict that the defendants were not negligent was not against the weight of the evidence.

We note as well that the testimony was conflicting on causation, although the jury did not reach this issue.[6] Plaintiffs' theory was that the acute hypoxic-ischemic event which the baby underwent just prior to her birth resulted in her cerebral palsy: Dr. Carl Hunt, expert neonatalogist, testified her injuries were caused by se-

vere, acute perinatal asphyxia occurring over a matter of minutes in the last 20-30 minutes prior to delivery. (N.T. 11/5/98 vol. 1 at 12, 22-23.) He also testified a baby with this severe case of perinatal asphyxia has a 20-30 times greater risk for developing cerebral palsy. (N.T. 11/5/98 vol. 1 at 22.) Dr. Keith Marks, the treating pediatrician, diagnosed her the morning after her birth with perinatal asphyxia resulting from her delivery. (N.T. vid. dep. 9/22/98 at 13.) Dr. Robert A. Zimmerman, a pediatric neuroradiologist, testified MRI brain studies taken when she was 8 years old revealed an injury which "occurred in and around the time of term and is associated with profound hypoxic-ischemic injury" and not the result of chronic hypoxic-ischemic injury. (N.T. 11/3/98 vol. 1 at 26, 28.) Dr. Cynthia Kaplan, a pediatric pathologist, ruled out chronic hypoxia and found no placental insufficiency based upon her review of placental slides and pathology report. (N.T. 11/3/98 vol. 3 at 28, 32-33.) Dr. Laird Jackson, a genetics expert, ruled out any genetic connection between the baby's cerebral palsy and that of her older half-brother. (N.T. 11/4/98 vol. 3 at 21, 24.) Finally, Dr. Timothy Murphy, pediatric pulmonologist, explained why the umbilical cord's venous cord pH (7.33), taken immediately after the baby's birth, was within normal range. He testified that venous cord pH measures placental acidity and arterial cord pH, the baby's. Based upon the venous pH, he opined the baby's pH at birth would have been 7.0 or below. (N.T. 11/6/98 vol. 1 at 17, 20, 28.) Normal newborn blood pH is 7.4 and a pH of below 7.2 considered acidotic. (N.T. 11/6/98 vol. 1 at 25.) An acidotic pH often reflects low oxygen levels. (N.T. 11/6/98 vol. 1 at 15.)

Defendants presented conflicting causation testimony, summarized as follows: Dr. Sonia Hulman, expert

6. Defendants did not present any evidence on damages. Thus, there was no conflicting testimony on that issue.

neonatalogist, testified the baby suffered from intra-uterine growth retardation, a chronic condition, resulting from placental insufficiency. (N.T. 11/9/98 vol. 3 at 25, 40-42.) She based her conclusions on the third trimester drop in baby's weight, placental condition including ratio of baby's weight to it, short cord and placental appearance, including evidence of chronic intrauterine infection, baby's apparent growth retardation, baby's difficulty in last moments of delivery and rapid fetal heart rate recovery. (N.T. 11/9/98 vol. 3 at 40-42.) Dr. Naeye, the pathologist who examined the mother's placenta the day after delivery, diagnosed her with chorioamnionitis and growth retardation. (N.T. 11/9/98 vol. 4 at 64.) Dr. Mark Scher, pediatric neurologist, testified that asphyxia was not probable in this case since it would create multi-organ failure, which he opined did not occur here. (N.T. 11/10/98 vol. 1 at 24, 34-39.) In addition, he testified any brain damage the baby suffered occurred prior to her admission to the hospital and not from an acute injury. (N.T. 11/10/98 vol. 1 at 44.) He also noted that her half-brother's cerebral palsy was significant since it linked that outcome to their mother who had a history of ulcerative colitis. (N.T. 11/10/98 vol. 1 at 47-48.) Finally, Drs. Polin, Hulman and Scher all disagreed with Dr. Murphy's correlation of a 7.33 venous pH to an arterial pH of 7.0 or lower, all noting that a close correlation usually exists between the two numbers. (N.T. 11/12/98 at 26; N.T. 11/9/98 vol. 3 at 28; N.T. 11/10/98 vol. 1 at 21, 23.) Thus, while the jury did not reach the causation issue, conflicting testimony existed.

### Time Restraints on Case Presentation

This case was scheduled over a two-week period from November 2-13, 1998. After discussion with counsel regarding time constraints on the case, including the fact the courthouse was closed for a holiday No-

vember 11, the parties agreed to a trial timeline implementing the court's goal of getting the case to the jury by noon Thursday, November 12. This would give the jury one and one-half days to deliberate, if necessary. Monday, November 2 was reserved for jury selection and opening statements. Plaintiffs would present their case beginning Tuesday, November 3 and conclude by noon on Monday, November 9. Defendants would then have one and one-half days to present their case, concluding by the end of the day Tuesday, November 10. Closings were to take place on Thursday morning. (See N.T. 11/5/98 vol. 4 at 31-34.)

Plaintiffs abided by this schedule but defendants were unable to. Defendants' standard of care expert, Dr. Polin, informed the court by letter he could not testify Tuesday, November 10 as previously scheduled. Therefore, Dr. Polin was moved to Thursday morning and defense counsel limited to a 40-minute direct examination. (N.T. 11/10/98 vol. 3 at 3.) Plaintiffs' counsel objected since it was not in conformance with the agreed schedule. (N.T. 11/10/98 vol. 3 at 3-5; N.T. 11/12/98 at 3.) Plaintiffs argue defendants should have presented Dr. Polin either by videotape or on Monday, November 9.

Clearly, it was within my discretion to allow Dr. Polin to testify Thursday, November 12, albeit with time constraints. Plaintiffs have failed to cite any authority whereby a relatively minor change in an agreed trial schedule warrants a new trial, nor do they suggest the rescheduling prejudiced them. See post-trial motion, ¶¶2-9. Furthermore, defendants did not ultimately receive a greater time allotment for evidence presentation than agreed to: defendants' counsel finished before 3 p.m. Tuesday, November 10 and the entire examination of Dr. Polin took less than one hour.

Accordingly, I denied plaintiffs' post-trial motions March 23, 1999.