**Rohm &.Haas Co. v. Continental Casualty Co.**

*William J. O'Brian* and *John G. Harkins*, for plaintiff.
*Gary W. Westerberg, Jerome B. Shestack* and *Elit R. Felix II,* for defendants.

HERRON, *J.,* February 26, 2002—Plaintiff Rohm & Haas Co. (R&H) has presented a motion for a new trial or, in the alternative, leave to conduct discovery and for a hearing. The motion is based on allegedly prejudicial events that took place nearly five years ago and that R&H discovered nearly three years ago. Because of R&H's delay in presenting the motion, as well as the substantive difficulties with the motion itself, it is denied.

## BACKGROUND

This case originated in November 1991 as a declaratory judgment action brought by R&H against defendants The Home Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Insurance Companies, and a number of its other insurers. The focus of the dispute was coverage under comprehensive general liability insurance policies for environmental remediation at two separate R&H sites in Myerstown, Pennsylvania (Whitmoyer site) and Bristol, Pennsylvania (Bristol site).

The trial was bifurcated by stipulation. The liability phase was tried before a jury from January 22, 1997 to March 26, 1997. On April 1, 1997, the jury returned a

verdict in favor of the defendants on liability for both sites and denied coverage,[1] whereupon R&H filed a motion for post-trial relief. On July 21, 1997, Judge Jaffe granted R&H's motion for judgment n.o.v. with respect to the Whitmoyer site, but denied the motion with respect to the Bristol site. Judge Jaffe then proceeded to try the damages phase without a jury from September 16, 1997, to November 7, 1997, and on December 31, 1997, entered judgment denying coverage as to the Bristol site but requiring the defendants to pay certain costs associated with the Whitmoyer site. The defendant then filed an appeal with regard to the Whitmoyer site judgment.[2]

On appeal, the Superior Court issued a decision on May 6, 1999, reversing Judge Jaffe's grant of judgment n.o.v., reinstating the jury's verdict and remanding the case for entry of judgment on the verdict. R&H then appealed to the Supreme Court, which affirmed the Superior Court's decision in all respects on October 18, 2001. The Supreme Court denied R&H's petition for reargu-

---

1. The jury found in favor of the defendants based, in part, on the "known loss" doctrine. This doctrine holds that "one may not obtain insurance for a loss that either has already taken place or is already in progress," *Rohm & Haas Co. v. Continental Casualty Co.,* 732 A.2d 1236, 1256 (Pa. Super. 1999) (citations omitted), and was formally recognized by Pennsylvania appellate courts in this case on appeal. See *Rohm & Haas Co. v. Continental Casualty Co.,* 566 Pa. 464, 781 A.2d 1172 (2001); *Rohm & Haas Co. v. Continental Casualty Co.,* 732 A.2d 1236, 1256 (Pa. Super. 1999).

2. Judge Jaffe wrote an exhaustive opinion summarizing the reasons for his decision. See *Rohm & Haas Co. v. Continental Casualty Co.,* 35 Phila. 193 (1997). R&H filed an appeal with respect to the Bristol site, but withdrew its appeal before it could be heard.

ment on December 5, 2001, and the case was remanded to the court of common pleas on December 18, 2001.

While this matter was on appeal, a complicating event was brought to the attention of Robert N. Feltoon, counsel for R&H. On May 20, 1999, Judge Jaffe, who had retired from the bench soon after judgment was entered, returned Mr. Feltoon's phone call regarding the Superior Court's decision and told him that during the jury phase, Sharon Dennison, one of the jurors, approached him in the courthouse but outside the courtroom and outside the presence of counsel. Ms. Dennison told Judge Jaffe that she was reading *A Civil Action,* a book about a lawsuit brought by residents of a Massachusetts town against W.R. Grace Corporation and Beatrice Foods for the adverse health effects that the corporations' industrial pollution had on the town's residents. Ms. Dennison commented further that the suit in the book was "just like this case" and that the book discussed one of the witnesses at trial in the instant case.[3] This witness was Dr. George F. Pinder, who testified on behalf of R&H with regard to the Bristol site and who is supposedly portrayed in an unflattering light in the book. Judge Jaffe made no record of the exchange, and R&H remained unaware of Ms. Dennison's comments until May 20, 1999.

R&H now asserts in the motion that Ms. Dennison's conduct undermined her ability to fulfill her obligations as an impartial juror and requires that a new trial be held.

---

3. In an interview with an investigator on December 20, 2001, Ms. Dennison supposedly acknowledged that many of these events occurred as described.

In the alternative, R&H asks that it be permitted to engage in discovery to develop a record on alleged juror misconduct. At no time prior to filing the motion did R&H raise these issues or the underlying evidence before the appellate courts or this court.

## DISCUSSION

The key issues raised by the parties are twofold: first, the procedural question of whether the motion is untimely, and second, the substantive question of whether R&H is entitled to the relief it seeks. On both of these issues, the defendants are correct, and the motion is denied.

### I. *R&H Has Waived Its Right To Have the Motion Considered*

The defendants argue that R&H's failure over the past two and one-half years to raise its "new evidence" in the manners available to it bar it from even presenting the motion. According to the defendants, both the trial court and the appellate courts provided forums for presenting the evidence, and R&H failed to take advantage of these opportunities. This argument is persuasive and poses an obstacle to reaching the merits of the motion.

As a general rule, Pa.R.C.P. 227.1(c) requires that post-trial motions, including motions for a new trial, be filed within 10 days of the date of entry of a verdict. However, this is not a hard and fast deadline, and under certain circumstances, a court may allow post-trial motions to be heard. See *e.g., Wittig v. Carlacci,* 370 Pa. Super. 584, 586, 537 A.2d 29, 30 (1988) (A court has

"broad discretion" to entertain untimely post-trial motions.).

The defendants contend that the broad discretion afforded the court is not so far-reaching as to make the motion appropriate. The primary case on which the defendants rely is *Hornick v. Bethlehem Mines Corp.*, 310 Pa. 225, 165 A. 36 (1933), where the trial court entered judgment in favor of the plaintiffs on January 8, 1932, and the Superior Court affirmed on April 28, 1932. On May 17, 1932, the defendant presented a petition to open the judgment to the trial, asserting that new evidence had been discovered since the trial.[4] After the trial court denied the defendant's petition, the defendant filed a second appeal, in response to which the Superior Court rejected the defendant's argument that the trial court had abused its discretion:

"It is to be observed . . . that no reason is given for not moving on or about March 1, 1932, as soon as the information is said to have been acquired. At that date, by appropriate petition, defendant could have brought the matter to the attention of this court before the appeal was disposed of on the merits as appellant then presented them. Instead of applying to the court below, as defendant apparently might have done, during the long period between the date of the verdict, January 17, 1931, and the time of taking the appeal to this court, January 29, 1932, or of thereafter applying to this court prior to argument March 21, 1932, as was done, for example, in

---

4. It appears from the Superior Court's opinion that the defendant made its discovery around March 1, 1932.

*Ralston v. Phila. Rapid Transit Co., No. 2,* 267 Pa. 278, 282, 110 A. 336 (1920), or prior to the decision of April 11, 1932, defendant filed a petition for reargument, as has been stated, and even then said nothing about the alleged after-discovered evidence. In such circumstances, we cannot say that there was abuse of discretion in dismissing the petition." 310 Pa. at 230-31, 165 A. at 38.

Thus, *Hornick* indicates that newly discovered evidence may be brought to the attention of an appellate court while the matter is on appeal to preserve the discovering party's right to present the issue. Cf. *Commonwealth v. Lloyd,* 319 Pa. Super. 6, 11-12, 465 A.2d 1025, 1027 (1983) (reinstating motion for a new trial based on evidence discovered after trial and relinquishing jurisdiction to lower court).

This assessment of *Hornick's* meaning is bolstered by *Fischer v. Hunsberger,* 153 Pa. Super. 572, 35 A.2d 91 (1943), in which the trial court entered judgment against the defendant on June 24, 1941, with a subsequent affirmance by the Superior Court and subsequent denials of reargument and appeal by the Superior Court, and the Pennsylvania and United States Supreme Courts. Over five months after the final denial, the defendant filed a petition to open judgment based on newly discovered evidence. The court affirmed the trial court's denial of the petition, stating that "[w]e know of no authority given a trial court to open and review a judgment entered on a verdict in a common-law action, because of alleged after-discovered evidence, after the judgment has been finally adjudicated and affirmed by an appellate court. . . ." 153 Pa. Super. at 573-74, 35 A.2d at 92. Ultimately, these cases are sufficient to convince the court that R&H

could have raised the arguments presented in the motion before the appellate courts entertaining the appeal in this matter.

R&H attempts to distinguish *Hornick* and *Fischer* on several grounds. Among these grounds are the facts that the Superior Court in *Hornick* addressed only whether the trial court abused its discretion, not whether it acted correctly, that the new evidence in *Fischer* related to the merits of the case and that the *Fischer* judgment had been finally adjudicated and affirmed. These arguments are spurious, at best, and do not undermine the basic similarities to the instant matter. Accordingly, the Pennsylvania appellate courts could have reviewed the arguments raised in the motion. As a second prong of attack, defendants assert that even if R&H could not have presented its motion to the appellate courts, it could have raised its new evidence before the trial court while the Whitmoyer site appeal was underway. Pa.R.A.P. 1701(c) addresses the effect of an appeal on a trial court's jurisdiction:

"(c) Limited to matters in dispute. Where only a particular item, claim or assessment adjudged in the matter is involved in an appeal, or in a petition for review proceeding relating to a quasijudicial order, the appeal or petition for review proceeding shall operate to prevent the trial court or other government unit from proceeding further with *only such item, claim or assessment,* unless otherwise ordered by the trial court or other government unit or by the appellate court or a judge thereof as necessary to preserve the rights of the appellant." Pa.R.A.P. 1701(c). (emphasis added)

See also, *Griffin v. Derzack,* 456 Pa. Super. 440, 456, 690 A.2d 1192, 1199 (1997) (Appeals from order termi-

nating mother's parental rights and order returning children to foster parents' home did not deprive court of jurisdiction to conduct contempt hearings against foster parents concerning violations of orders concerning care and custody of children because "the orders challenged in pending appeals were neither relevant to nor at issue in contempt proceedings"); *Commonwealth v. Moyer,* 421 Pa. Super. 102, 106-107, 617 A.2d 744, 746-47 (1992) (holding that the trial court had jurisdiction to sentence appellant for robbery and burglary because the appeal that was pending related only to appellant's murder conviction and because "[t]he stay prescribed in Rule 1701(a) . . . is limited to matters in dispute on appeal").

In this instance, Dr. Pinder testified almost exclusively with regard to the Bristol site, and the appeal related to only the Whitmoyer site, leaving judgment as to the Bristol site within the potential purview of the trial court. Any alleged improper influence on the jury could therefore have been addressed and examined by the trial court, as well. Accordingly, both the trial court and the appellate courts were available for R&H to raise the after-discovered evidence.

In spite of these opportunities, R&H failed to take advantage of the avenues available for raising its "new evidence." After becoming aware of Judge Jaffe's conversation with Ms. Dennison, R&H made numerous filings with Pennsylvania's appellate courts.[5] None of these

---

5. Among R&H's filings were an application to the Superior Court for reargument en banc on June 1, 1999, a petition to the Pennsylvania Supreme Court for allowance of appeal on August 27, 1999 and two briefs filed with the Pennsylvania Supreme Court on June 30, 2000 and September 15, 2000.

filings raised the issue of Ms. Dennison's conduct or requested that the case be remanded to the trial court to address any after-discovered evidence. Similarly, at no point prior to filing the motion did R&H present any after-discovered evidence to the trial court or attempt to do so. This inaction militates in favor of treating the arguments raised in the motion as waived.

R&H proffers several excuses as to why its delay in presenting the motion or taking similar action does not constitute a waiver of its right to request a new trial or additional discovery. Among these arguments are the assertions that there was insufficient time to raise new issues on appeal, that presenting new issues on appeal would have led to judicial inefficiency and distracted the appellate courts from the important questions on appeal and that the failure to raise the new issues was intended to protect Judge Jaffe and Ms. Dennison from embarrassment.

None of these excuses are valid. R&H's final filing with the Pennsylvania Supreme Court was not made until September 15, 2000, nearly four months after Mr. Feltoon spoke with Judge Jaffe about his interaction with Ms. Dennison. In addition, any purported benefit to judicial efficiency is negated by the fact that raising the motion now has the potential to impose a second appeals process in this case.

Moreover, R&H has not suggested and the court cannot construct a rule that would allow R&H to present the motion while preserving a final judgment. If the court were to excuse the delay based on the fact that R&H was battling before the Commonwealth's appellate courts, after-discovered evidence could be held as a party's

ace-in-the-hole for years while the potentially lengthy appeals process continued. This would undermine the obvious interest in preserving the sanctity of a judgment. See *Clark v. Troutman,* 509 Pa. 336, 340, 502 A.2d 137, 139 (1985) ("Finality of litigation is essential so that parties may rely on judgments in ordering their private affairs and so that the moral force of court judgments will not be undermined."). If R&H were entitled to have the motion considered, it would render a judgment meaningless and would permit a party's investigation into procedural and substantive issues to continue long after the trial had been completed.

The court also notes that each of R&H's arguments as to why a party does not waive the arguments it does not raise loses its coherence when one considers the effect on the administration of justice and the court system as a whole. Several Pennsylvania courts have remarked that an improper influence on a jury is a blow not only to the specific party affected, but also to the integrity of the fact finding process and the function and role of the jury. *Commonwealth v. Saunders,* 454 Pa. Super. 561, 569, 686 A.2d 25, 29 (1996) (noting that "measures [need be] taken to insure the integrity of the jury function"); *Commonwealth v. Trolene,* 263 Pa. Super. 263, 271, 397 A.2d 1200, 1204 (1979) (noting the goal of "preserv[ing] the public integrity of our system of justice from any appearance of impropriety"). A party that is aware of but fails to present evidence of an improper influence on a juror may therefore be breaching its obligations to the tribunal, regardless of whom the improper influence benefited. Indeed, if the court excuses R&H's failure to raise Ms. Dennison's conduct earlier, it sends the message that

a party has no immediate obligation to disclose improper conduct that may have bent a jury's verdict in its favor. This the court will not do.

In sum, R&H had the opportunity to present its new evidence to either the trial court or the appellate courts. Its failure to do so for almost three years makes the motion untimely, and the court has no obligation to entertain it now.

## II. *R&H Has Not Presented Grounds for the Court To Grant a New Trial or Additional Discovery*

Although R&H's motion is untimely, the court will nevertheless address the motion on substantive grounds, as well. In the motion, R&H requests a new trial or, in the alternative, additional discovery and a hearing to investigate other possible extraneous influences on the jury. This request is based on both Ms. Dennison's reading of *A Civil Action* and her ex parte contact with Judge Jaffe. Because the motion is without any legitimate substantive basis, both of the requests for relief are denied.

### 1. R&H Is Not Entitled to a New Trial

In determining whether to grant a new trial based on either allegedly extraneous matters considered by a jury or ex parte conduct between a juror and the judge, a court must examine whether such matters create a reasonable likelihood of prejudice. *Carter by Carter v. United States Steel Corp.,* 529 Pa. 409, 421, 604 A.2d 1010, 1016-17 (1992). To determine whether a reasonable likelihood of prejudice exists, a trial court should look, in part, at "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2)

whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." *Id.* 529 Pa. at 421-22, 604 A.2d at 1017.

The burden of establishing a reasonable likelihood of prejudice is a relatively severe one. In *Carter,* for example, two jurors had watched a television broadcast regarding a subsequent accident on the defendant's property and communicated with other jurors about the broadcast. Even though evidence of similar subsequent accidents had been precluded at trial, the Pennsylvania Supreme Court reversed the trial court's order granting a new trial because a reasonable likelihood of prejudice had not been shown. See also, *Orndoff v. Wilson,* 760 A.2d 1, 3-4 (Pa. Super. 2000) (Jury foreman's visit to scene of accident, despite instructions not to do so, was not prejudicial.); *Passarelli v. Shields,* 191 Pa. Super. 194, 156 A.2d 343, 348 (1959) (Where jurors read newspaper article of arbitration board's earlier verdict for plaintiff, the court's instruction that the jurors were not to consider the article ensured that the defendant was not prejudiced.). Cf. *Commonwealth v. Miller,* 247 Pa. Super. 132, 139, 371 A.2d 1362, 1366 (1977) (Defendant convicted for involvement with robbery and shooting was not entitled to a mistrial even though juror stated that guns are dangerous and that juror hated guns because this did not "indicate such bias by the juror which would affect his impartiality or ability to fairly consider the evidence in determining guilt or innocence.").[6]

---

6. To the extent that R&H relies on decisions from outside the Commonwealth, it is worth noting that the test used to determine whether

Although Ms. Dennison's reading of *A Civil Action* constitutes an influence that was not presented at trial, it is not central to the issues in dispute. Moreover, it is clearly open to speculation and heated disagreement between the parties as to whether the content of the book is so highly emotional and inflammatory as to have had an effect on Ms. Dennison or to have caused her to disregard the instructions directing her to decide the case on the merits. Furthermore, the description of Dr. Pinder in *A Civil Action* is certainly not all negative or uniformly detracting. While some of the characteristics ascribed to Dr. Pinder's mannerisms are not particularly complimentary, the book describes him as "pre-eminent in his field" and "the world's leading expert on groundwater," and states that "[e]very geologist who knew anything about groundwater had heard of Pinder." *A Civil Action* at 325-26. The plaintiffs' attorney felt "fortunate" to have Pinder as a witness, and the defendants' attorney "tried to recruit Pinder as an expert witness . . ., but found that [the plaintiffs' attorney] had gotten to . . . Pinder, first." *Id.* Even W.R. Grace's expert witness stated that he respected Dr. Pinder "as a person and as a professional." *Id.* at 353. The portion of *A Civil Action* describing Dr. Pinder and his testimony concludes by stating that "[a]s it later turned out, Pinder was generally right" and that the final report reviewing the site in question "vindicated Pinder. . . ." *Id.* at 339. Thus, when read as a whole, Dr. Pinder's portrayal in *A Civil Action* is not the overwhelm-

---

an extraneous influence merits a new trial varies from jurisdiction to jurisdiction. See *Carter,* 529 Pa. at 421 n.6, 604 A.2d at 1016 n.6 (providing examples of tests used in other jurisdictions).

ingly unfavorable telling that R&H would have the court believe.

The fact that *A Civil Action* may present large corporations in general in an unflattering light also is not sufficient to find a reasonable likelihood of prejudice. Even if the book "portrays a highly unfavorable image of large corporations and their environmental practices," Pl. br. 5, as R&H asserts, any impact that the book would have in general is limited by several factors. First, the instant case involved R&H suing its insurers over policy coverage, and not the conflict between another large corporation (*i.e.,* not R&H) and leukemia-stricken townspersons over serious injuries that is presented in *A Civil Action*.[7] There is a world of difference between deciding if R&H's knowledge of the sites' condition permitted the defendants to deny coverage under the policy, and determining if several large corporations poisoned the water supply of a small town. In addition, Judge Jaffe gave instructions that the jury's decision was to be based on only the evidence presented and that the case was not about "whether Rohm and Haas or the insurance companies are good or evil." Tr. Mar. 26, 1997 p.m. sess. at 29, 30, 35. Cf. *Paz v. United States,* 462 F.2d 740, 745 (5th Cir. 1972) (remanding case where jurors read books that described conduct similar to that of which defendant was

---

7. R&H relies on this distinction to attack Ms. Dennison's comments that *A Civil Action* was "just like this case" on substantive grounds. However, as discussed *infra,* the court will not violate the privacy that protects a juror's thought processes by peering into Ms. Dennison's head, and the similarities Ms. Dennison perceived between the instant case and *A Civil Action* are beyond the potential scope of the court's inquiry.

accused and that had been left in jury room, and no corrective or cautionary instruction was given); *Carter,* 529 Pa. at 423, 604 A.2d at 1017 (relying on trial court's instruction to jurors to look solely at the evidence and the law of the case to conclude that there was no reasonable likelihood of prejudice). Moreover, granting a new trial because one juror read a book that maligns an entity vaguely similar to a litigating party would require either that a court screen all outside influences to which a juror could be subjected or that orders granting new trials be issued more frequently. Neither of these options is particularly appealing.

Thus, there is no reasonable likelihood that R&H was prejudiced by Ms. Dennison's reading *A Civil Action.* To hold otherwise would allow a discontented party to challenge any jury verdict where a single juror had an awareness of an outside influence that was only tangentially related to the issues presented.

Judge Jaffe's ex parte contact with Ms. Dennison similarly does not support granting a new trial. The rule prohibiting ex parte conduct cannot be examined in a vacuum:

"The reason for prohibiting a trial judge from communicating with a jury ex parte is to prevent the court from unduly influencing the jury and to afford counsel an opportunity to become aware and to seek to correct any error which might occur. *Where there is no showing either that the court's action may have influenced the jury or that its directions were erroneous, then the reason for the rule dissolves.*" *Commonwealth v. Bradley,* 501 Pa. 25, 37, 459 A.2d 733, 739 (1983) (quoting *Yarsunas v. Boros,* 423 Pa. 364, 368, 223 A.2d 696, 698

(1966) (Roberts, J., dissenting)). (emphasis in original) See also, *Colosimo v. Pennsylvania Electric Co.,* 513 Pa. 155, 163, 518 A.2d 1206, 1210 (1986) ("[T]he trial court is not authorized to grant a new trial unless prejudice to the moving party was likely from the contact."); *Commonwealth v. Richardson,* 476 Pa. 571, 579, 383 A.2d 510, 514 (1978) ("It would be jurisprudentially unsound to endorse a rule of law proscribing every circumstance, whether deliberately contrived or not, which provided an opportunity for an untoward influence to be exercised, without the necessity of establishing that there was, in fact, prejudice resulting from the event."). There is no allegation that Judge Jaffe made any comments to Ms. Dennison, and Ms. Dennison's expression of her thoughts alone does not create a reasonable likelihood of prejudice. Certainly, Judge Jaffe acted inappropriately under the circumstances. See *Bradley,* 501 Pa. at 37-38, 459 A.2d at 739 ("[F]ailure to maintain an accurate and reviewable contemporaneous record of all instructions and communications between the court and a jury may force an implication of prejudice where arguably none exists.").[8] However, this does not warrant granting a new trial.

---

8. This was not the only way in which Judge Jaffe may have arguably behaved inappropriately in this case, as commented on by the Superior Court:

"After the jury returned its verdict, the individual jurors returned to the jury room. The trial judge joined them there and, as alleged in the sworn affidavits of two of the jurors present, the judge told the jurors:

"(a) that he had seen evidence that the jury had not seen and that the jury would have returned a different verdict if it had seen that evidence;

"(b) that the jury made the wrong decision in its verdict;

R&H appears to take a second swipe at sustaining its argument, relying on the Pennsylvania Supreme Court's statement that after-discovered evidence may merit a new trial where "(1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and (2) that the existence of the evidence would have compelled a different result in the case." *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 224, 489 A.2d 1291, 1301 (1985). For the same reasons that there is no reasonable likelihood of prejudice, it is difficult to fathom how any of the alleged conduct would have compelled a verdict in R&H's favor, and R&H's request for a new trial is denied.

## 2. R&H Is Not Entitled To Additional Discovery

There is also no reason why R&H is entitled to additional discovery on this matter. Although discharged jurors may testify as to the existence of outside influences during their deliberation, they generally may not speak

---

"(c) that the insurance companies had recently lost another case in Pittsburgh;

"(d) that Rohm & Haas is a very good company;

"(e) that the existence of old company records from so far back in time proved that Rohm & Haas had nothing to hide;

"(f) that Rohm & Haas has sites all over the country that will cost them billions of dollars to settle; and

"(g) that the jury should have noticed that Travelers and Aetna had settled with Rohm & Haas.

"One of the jurors reported 'I then asked [the judge] how his honor could be so biased when I thought a judge was to be impartial, to which [the judge] responded that he was only human.' " 732 A.2d at 1245-46.

to the actual effect of the extraneous matter on their deliberations:

"Briefly stated, the need to ensure fair trials, free from improper influences must be balanced with the need for finality and for protecting the sanctity of the jury room. The rule in Pennsylvania, as well as in a majority of jurisdictions, is that a juror is incompetent to testify as to what occurred during deliberations. . . . This rule is often referred to as the 'no impeachment' rule. However, in order to accommodate the competing policies in this area, a narrow exception has been recognized. The exception permits post-trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations. . . . Under this exception, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. . . . Under no circumstances may jurors testify regarding their subjective reasoning processes." *Carter,* 529 Pa. at 415, 604 A.2d at 1013. (citations and quotation marks omitted) See also, Pa.R.E. 606; *Commonwealth v. Zlatovich,* 440 Pa. 388, 396, 269 A.2d 469, 473 (1970) ("[W]hile we permit discharged jurors to testify as to the existence of outside influences during their deliberation, nevertheless, we prohibit them from testifying as to the *effect* which these extra-evidentiary influences had upon the jurors in reaching a decision. . . ."). (emphasis in original)

In situations where a juror may have been influenced by outside conduct, the Pennsylvania Supreme Court has advised as follows:

"Because a trial judge is precluded from considering evidence concerning the subjective impact of an extra-

neous influence on any juror, it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. In order to determine whether an extraneous influence is prejudicial, a trial judge must determine *how an objective, typical juror would be affected by such an influence. . . .* In addition, cases from other jurisdictions which have considered the prejudicial erect of an extraneous influence, make clear that prejudice is to be determined in light of the facts and circumstances in each case. Where the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to *the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case."* Carter, 529 Pa. at 420, 604 A.2d at 1016. (citations and quotation marks omitted) (emphasis added)

Simply put, it is difficult to see what additional discovery would add to R&H's argument. Indeed, this memorandum construes all facts in R&H's favor and accepts their allegations as true. Moreover, R&H's reliance on *Boring v. LaMarca,* 435 Pa. Super. 487, 646 A.2d 1199 (1994), is misplaced. In *Boring,* a juror had read a portion of an unspecified law book addressing the terms bad faith, written notice and writing during deliberations, but there was no evidence on the record as to what precisely the book stated or how it compared with what had been presented at trial. On appeal, the Superior Court pointed out that the ambiguous nature of the extraneous influence could have been determined through depositions or a post-trial hearing and reversed the trial court's grant of a new trial in part on this basis. 435 Pa. Super. at

493, 646 A.2d at 1203. In the instant dispute, in contrast, additional discovery would provide nothing beyond what the court has already presumed to be true for the purposes of this discussion. Accordingly, R&H is not entitled to additional discovery.

## CONCLUSION

For both substantive and procedural reasons, R&H is not entitled to a new trial or additional discovery. Accordingly, the motion is denied.

## ORDER

And now, February 26, 2002, upon consideration of the motion for a new trial based on newly discovered evidence of improper juror exposure to extraneous prejudicial information and for leave to conduct discovery and for a hearing on the issue of improper juror exposure to extraneous prejudicial information of plaintiff Rohm & Haas Co., and the response thereto of defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies, and in accordance with the contemporaneously filed opinion, it is hereby ordered and decreed that the motion is denied. Judgment is hereby entered on the verdict in accordance with the decision of the Pennsylvania Superior Court as affirmed in its entirety by the Pennsylvania Supreme Court.